Filed 5/28/15  Jangozian v. Farmers Ins. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VARTAN V. JANGOZIAN et al., | B247864 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BC447829) |
| FARMERS INSURANCE EXCHANGE, | |
| Defendant and Respondent. | |
| | |
| SIMON POGOSSIAN et al., | B250426 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BC447829) |
| MID-CENTURY INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEALS from judgments and orders of the Superior Court of Los Angeles County.  William F. Highberger, Judge.  B247864 (Jangozian plaintiffs) affirmed in part and reversed in part with directions; B250426 (Pogossian plaintiffs) affirmed.

Gary Rand & Suzanne E. Rand-Lewis and Suzanne E. Rand-Lewis for Plaintiffs and Appellants.

Tharpe & Howell, Christopher S. Maile, Stephanie Forman and Eric B. Kunkel for Defendants and Respondents.

_____

Plaintiffs in each of the consolidated appeals alleged that smoke and ash from a wildfire damaged their homes. Each set of plaintiffs submitted a claim for damage under their homeowners insurance policy. Plaintiffs were dissatisfied with their respective insurer's handling of their claims and filed the separate underlying actions, which were consolidated in the trial court. In the Jangozian case, the trial court granted summary judgment in favor of the insurer, and in the Pogossian case, the court granted the insurer's motion for discovery-related terminating sanctions. Each set of plaintiffs appealed, and we consolidated the appeals.

**THE JANGOZIANS' CASE**

## BACKGROUND

On December 17, 2010, plaintiffs Vartan and Anna Oleva Jangozian sued Farmers Insurance Group and respondent Farmers Insurance Exchange (Farmers) on several theories after Farmers partially denied plaintiffs' claim for smoke and ash damage to plaintiffs' house in Glendale resulting from the Station Fire. The operative second amended complaint asserted the following causes of action against Farmers: breach of contract; breach of implied covenant of good faith and fair dealing; violation of Business and Professions Code section 17200; intentional infliction of emotional distress; fraud; and violation of the Unruh Civil Rights Act, Civil Code section 51 (Unruh Act).

In allegations incorporated in every cause of action, plaintiffs allege in the second amended complaint that the Station Fire "broke out" on August 26, 2009, and "raged uncontained for more than a month." Plaintiffs further alleged that the fire "blanketed foothill communities in a thick cloud of ash and left many homes inundated with smoke and ash." They averred that their own house "was inundated with smoke and ash from

2

that fire, which caused damage to both the exterior and interior of Plaintiffs' premises." Plaintiffs alleged that their home "sustained covered direct physical losses" "on or about August 26, 2009." Plaintiffs also alleged that they "noticed soot and ash as well as an odor that began to permeate the house and its furnishings" "[s]ubsequent to the Station Wildfire which raged for approximately 6 weeks."

Plaintiffs did not submit a claim under their homeowners insurance policy until February 18 or 19, 2010. Plaintiffs alleged they "did not realize the damage sustained from the smoke and ash was covered under their homeowners insurance policy" until they "spoke with some of their neighbors several months later, who had submitted similar claims to their homeowners insurance companies and were paid for their damages."

Farmers's employee Kenneth Holker (Holker) inspected plaintiffs' house on March 12, 2010, with the assistance of Forensic Analytical Consulting Services, Inc. (FACS), which took samples from plaintiffs' house. Plaintiffs alleged the inspection and sampling were inadequate and fraudulent, in that Farmers and FACS had already decided that they would deny the claim based on "a list of attorneys and insureds whose claims they had predetermined were 'suspect' and would not pay." More specifically, plaintiffs averred that Holker "had numerous similar claims, also from insured's [*sic*] of Armenian ethnicity that he and [FACS] had already denied. He knew that he was going to reject the claim without evaluating it."

On March 17, 2010, Farmers, through Holker, sent plaintiffs a letter notifying them that additional time would be required. The letter stated in pertinent part: "To properly investigate and evaluate your claim, I will need additional time to make a final determination. The reason(s) for the additional time needed is for the completion and review of expert hygienist report. [¶] In compliance with the California Fair Claims Settlement Practices Regulation 2695.7(c), I will be contacting you within the next 30 days to advise you of the status of my investigation and evaluation of your claim." The letter then informed plaintiffs of the limitations period: "California law and regulations require that we provide you with written notice of any limitation period upon which we may rely to deny a claim. [¶] Please refer to paragraph 12 in the **Section I –**

3

**Conditions** part of your policy, which states: [¶] 12. *Suit Against Us*. We may not be sued unless there has been full compliance with all the terms and conditions of this policy. Suit on or arising out of this policy must be brought within one year after the loss occurs." Finally, the letter informed plaintiffs of how to contact the state Department of Insurance if they believed "all or part of your claim has been wrongfully denied."

On April 13, 2010, Farmers, through Holker, sent plaintiffs a letter partially denying and partially granting their claim. Enclosed with the letter were a copy of FACS's report and a check in the amount of $2,151.31, which plaintiffs accepted. The letter stated in pertinent part: "This correspondence will provide you with the results of Fire Insurance Exchange's investigation and evaluation regarding the above-referenced claim. . . . [¶] Enclosed please find a copy of the report prepared by Forensic Analytical. As you will recall, Fire Insurance Exchange retained Forensic Analytical to provide expert technical assistance in the investigation and evaluation of the alleged damages to the subject property. Specifically, Forensic Analytical conducted sampling at the subject property to determine the extent of soot and ash contamination, if any, and had the samples sent to an independent lab for analysis. [¶] As more fully set forth in the report, Forensic Analytical determined there were insufficient levels of smoke, ash and/or soot related to the August 2009 wildfires to require any remediation for the personal property of the residence. However, Forensic Analytical recommends the shutters/blinds and window sills and tracks be wiped down, the exterior surfaces be power washed and attic insulation be replaced and attic cleaned due to sufficient levels of smoke, ash, and/or soot. As the entirety of the report is significant, we suggest you read it carefully for additional information and explanation."

The April 13, 2010 letter then set forth a table listing separate columns for "Building" and "Contents." In the "Building" column, the table listed $3,181.49 as the "Estimate for Damages," deductions for "Recoverable Depreciation" and "Deductible," and an "Actual Cash Value Payment" of $2,151.31. All entries in the "Contents" column were zeros. The paragraph following the table stated, "You may have the repairs made by an independent contractor of their [*sic*] choice. If for any reason the contractor

4

indicates the Replacement Cost estimate is incorrect, please call me *before* the work begins. If you do not call me before the work is started, this could affect your ability to obtain any additional payments."

The April 13, 2010 letter continued, "Based on the foregoing, we regret to inform you that Fire Insurance Exchange must partially deny the present claim for smoke, ash and/or soot damage." The letter then informed plaintiffs how to contact the state Department of Insurance if they believed "the decision in this matter is incorrect," and advised them of the statute of limitations: "The policy of insurance applying to the present claim contains the following condition, as authorized under Insurance Code §2071: [¶] Please refer to paragraph 12 in the Section I – Conditions part of your policy, which states: [¶] 12. *Suit Against Us*. We may not be sued unless there has been full compliance with all the terms and conditions of this policy. Suit on or arising out of this policy must be brought within one year after the loss occurs. [¶] By law, the time spent by the insurer investigating and processing the claim does not count toward the one-year period within which a lawsuit regarding the loss must be commenced." The letter also advised plaintiffs, "If you are in possession of any additional or different factual information that you believe would affect this decision, please notify us immediately." The letter noted Farmers was not waiving any terms or conditions of the policy or any defenses it had or might have.

Plaintiffs sent Farmers a letter dated June 1, 2010, expressing "concern and unhappiness regarding Apr 13/2010 report . . . estimate and forensic analytical expert and their results." The letter stated plaintiffs had hired their own experts, whose reports were enclosed, and demanded payment of $24,166.14, the amount of an estimate by Patterson Construction (Patterson). The accompanying report by Safeguard Envirogroup, Inc. (Safeguard) reflected that its employees observed "light to moderate levels of dark-colored particulates" in the interior of the house at "[p]oints of entry" such as windows and doors and in the garage. They also observed such particulates on exterior "finishes" and around points of entry. Laboratory testing of samples collected by Safeguard "revealed evidence indicating the presence of fire byproduct particulates on all surfaces

5

sampled in the areas investigated."  Safeguard recommended "specialty cleaning" of the following specified locations:  "*__Interior__*  [¶  1)  Clean the points of entry (i.e. interior windowsills and frames, window tracks, shutters, dressings and blinds, slider tracks, perimeter door thresholds, affected baseboards and proximate floor areas).  [¶]  a) Use HEPA vacuuming and damp methods, such as wiping with a damp disposal cloth with detergent and water mix.  [¶]  *__Exterior__*  [¶]  . . .  [¶]  1)  Pressure wash/scrub/disinfect all exterior surfaces including walls, walks, drives, decks, siding, exterior features, window and deck screens, etc."  Safeguard also suggested "indoor mechanical air filtration" until ash and soot on the ground were absorbed.

On June 14, 2010, Farmers, through Holker, sent plaintiffs a letter providing "the results of Fire Insurance Exchange's re-evaluation of the above-referenced claim" in light of plaintiffs' letter, the Safeguard report, and the estimate of plaintiffs' contractor. Farmers observed, "According to the testing performed by Safeguard Envirogroup, Inc. compared to that done by Forensic Analytical, the damages are the same with the exception of the attic cleaning and insulation replacement recommended by Forensic Analytical.  Accordingly, no further payment is owed."  The letter continued, "We are denying the damages as submitted by Patterson Construction in the estimate provided as they are not supported by the findings of a certified hygienist and are in conflict with the findings of Forensic Analytical and Safeguard Envirogroup, Inc. . . .  The claim result based on and including the hygienist reports from Forensic Analytical was provided in our correspondence of April 13, 2010 at which time we closed our file."

The June 14, 2010 letter also reiterated the advisements to plaintiffs about contacting the Department of Insurance, the one-year limitations period, and tolling.  It then noted, "As the claim is now closed, any and all tolling of the one-year period ceases as of the date of this letter."

On September 23, 2010, counsel for plaintiffs, Gary Rand, sent Farmers, FACS, and plaintiffs' insurance agent a letter asserting they had violated a number of provisions of Civil Code section 1770 and demanding a remedy within 30 days.  The letter listed the insurance policy number, claim number, and "Date of Loss:  August 30, 2009."

Farmers, through Holker, responded to plaintiffs' counsel in writing on October 2, 2010, stating, "We have completed a thorough investigation and have advised your client of the results in our letter dated April 13, 2010 and again in response to the hygienist report provided for review on June 14, 2010." The letter reiterated the limitations period, enclosed copies of the April 13, 2010 and June 14, 2010 letters and FACS's report, and asked counsel to provide plaintiffs with copies of the enclosures "as soon as possible."

Farmers's answer to the second amended complaint asserted a number of affirmative defenses, including the one-year limitations period.

Farmers moved for summary judgment or summary adjudication of issues with respect to each cause of action on the sole ground that the cause of action was barred by the statute of limitations. The trial court granted summary judgment in favor of Farmers.

The court concluded that there was no triable issue of fact that "the insureds had an awareness of alleged covered loss by the end of August 2009 . . . . Perhaps the loss was aggravated thereafter, but that does not change the salient fact that by their admissions and allegations they were aware of a loss no later than August 30, 2009." The court further concluded the statute of limitations was not tolled between the dates of April 13, 2010 (when Farmers sent its letter partially denying and partially granting plaintiffs' claim) and June 1, 2010 (when plaintiffs wrote to Farmers and enclosed their expert's report and contractor's estimate). Thus, the trial court calculated that plaintiffs filed their original complaint 407 days after the August 30, 2009 inception of loss date, and action on the policy was time-barred. The appeal before us depends largely on whether this conclusion was correct.

Finally, the court concluded that every cause of action that plaintiffs asserted against Farmers arose out of plaintiffs' rights under the insurance contract, and thus the one-year statute of limitations barred plaintiffs' other causes of action despite their labels. The appeal also turns on whether the trial court erred in this finding.

Farmers filed a memorandum of costs, seeking a total of $14,843.03. Plaintiffs moved to strike or tax costs, which the trial court denied. Plaintiffs filed a timely appeal.

7

**DISCUSSION**

**1.     Propriety of granting defendant's summary judgment motion**

     **a.     Pertinent principles governing summary judgment motions**

A party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he or she is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A triable issue of material fact exists if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion. (*Ibid.*) The moving party also bears the initial burden of producing evidence to make a prima facie showing of the nonexistence of any triable issue of material fact. (*Ibid.*)

A defendant moving for summary judgment must show, with respect to each of the plaintiff's causes of action, that either one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).)[1] Upon such a showing, the burden shifts to the plaintiff to prove the existence of a triable issue of material fact regarding the element or defense addressed by the defendant's motion. (*Ibid.*) "If the moving defendant argues that it has a complete defense to the plaintiff's cause of action, the defendant has the initial burden to show that undisputed facts support each element of the affirmative defense. Once it does so, the burden shifts to plaintiff to show an issue of fact concerning at least one element of the defense." (*Bacon v. Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 858.)

A plaintiff opposing a defendant's motion for summary judgment "may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (§ 437c, subd. (p)(2).)

We review a trial court's entry of summary judgment de novo. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.)

---

[1] Undesignated statutory references pertain to the Code of Civil Procedure.

### b. Principles pertinent to application of the limitations period

Insurance Code section 2071, subdivision (a) provides the standard fire insurance form and includes the following provision: "No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 12 months next after inception of the loss."

Inception or occurrence of the loss is "determined by reference to reasonable discovery of the loss and [does] not necessarily turn on the occurrence of the physical event causing the loss." (*Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 686 (*Prudential-LMI*).) "The insured's suit on the policy will be deemed timely if it is filed within one year after 'inception of the loss,' defined as that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered. To take advantage of the benefits of a delayed discovery rule, however, the insured is required to be diligent in the face of discovered facts. The more substantial or unusual the nature of the damage discovered by the insured (e.g., the greater its deviation from what a reasonable person would consider normal wear and tear), the greater the insured's duty to notify his insurer of the loss promptly and diligently." (*Id.* at pp. 686–687.) "Once any damage becomes reasonably apparent the time begins to run, even if the full extent of the damage is unknown. 'The inception of the loss occurs when the insured should have known that *appreciable damage* had occurred, not when the homeowner learned the true extent of the damage.' [Citation.]" (*Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1086 (*Doheny Park*).) An insured's belated discovery of potential coverage is irrelevant to the inception of loss date. (*Abari v. State Farm Fire & Casualty Co.* (1988) 205 Cal.App.3d 530, 535 (*Abari*).)

The limitations period is tolled from the time the insured gives notice of the damage to the insurer until the insurer formally denies coverage. (*Prudential-LMI*, *supra*, 51 Cal.3d at p. 693.) "This has been construed to mean 'unequivocal' denial in

writing." (*Migliore v. Mid-Century Ins. Co.* (2002) 97 Cal.App.4th 592, 604 (*Migliore*).) "The reason for the tolling rule is to avoid penalizing the insured for the time consumed by the insurer investigating the claim, while preserving the "'central idea of the limitation provision [that] an insured will have only 12 months to institute suit."'' [Citation.]" (*Marselis v. Allstate Ins. Co.* (2004) 121 Cal.App.4th 122, 125.) There is no requirement, however, that the insurer take "firm, unmovable positions" (*Liberty Transport, Inc. v. Harry W. Gorst Co.* (1991) 229 Cal.App.3d 417, 429) or use particular "magic" words, even the word "deny" (*Migliore*, at p. 605) to achieve the requisite unconditional denial.

"Claims arising out of the contractual relationship are subject to the contractual limitations period contained in the insurance policy." (*Lawrence v. Western Mutual Ins. Co.* (1988) 204 Cal.App.3d 565, 575.) "[A]n action seeking damages recoverable under the policy for a risk insured under the policy is merely a 'transparent attempt to recover *on the policy.*' [Citing *Abari*, *supra*, 205 Cal.App.3d at p. 536.] As such, it is subject to the policy's statute of limitations." (*Jang v. State Farm Fire & Casualty Co.* (2000) 80 Cal.App.4th 1291, 1301.) This includes a "bad faith cause of action based on failure to pay benefits" and any other claim, such as intentional infliction of emotional distress, that is "merely a theoretical restatement of the same claim." (*Prieto v. State Farm Fire & Casualty Co.* (1990) 225 Cal.App.3d 1188, 1196 (*Prieto*).) Where "the essence" of a cause of action "is an attempt to recover '[d]amages for failure to provide benefits under subject contract of insurance,'" it is "'fundamentally a claim on the policy.'" (*Magnolia Square Homeowners Assn. v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1063 [limitations period applied to "bad faith, breach of fiduciary duties and breach of statutory duties" causes of action].)

An insurer may waive, i.e., intentionally relinquish its right to rely upon, the expiration of a limitations provision. (*Singh v. Allstate Ins. Co.* (1998) 63 Cal.App.4th 135, 144 (*Singh*).) Alternatively, "an insurer may be estopped to assert a policy provision limiting the time to sue where it has caused the insured to delay filing suit until after the expiration of the time period." (*Doheny Park*, *supra*, 132 Cal.App.4th at p. 1090.) Conduct leading to application of the estoppel doctrine includes "lead[ing] its insured to

10

believe that an amicable adjustment of the claim will be made, thus delaying the insured's suit" (*Prudential-LMI*, *supra*, 51 Cal.3d at p. 690), failing "to notify a claimant of any applicable time limits that might apply to the claim" (*Doheny Park*, at p. 1091), and incorrectly representing that the cost of repairing the damage was less than the deductible (*Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1152).

**c.     The trial court properly granted summary adjudication with respect to all but the seventh cause of action, and thus erred in granting summary judgment**

**(1)     Inception of loss date**

In conformity with Insurance Code section 2071, plaintiffs' homeowners insurance policy provided that any "[s]uit on or arising out of this policy must be brought within one year after the loss occurs."

Plaintiffs contend that the trial court erred by concluding there was no triable issue of material fact regarding the inception of loss date. Based upon our de novo review of the parties' separate statements of fact and the evidentiary support cited therein, we conclude that there was no triable issue of material fact regarding the inception of loss date. Plaintiffs' admissions in their pleadings and depositions establish that by the end of August 2009, plaintiffs knew that smoke and ash from the wildfire had entered their home and caused appreciable damage.

Plaintiffs' second amended complaint alleges that the wildfire began August 26, 2009, and that plaintiffs' house "was inundated with smoke and ash from that fire, which caused damage to both the exterior and interior of Plaintiffs' premises." The first (breach of contract) and second (breach of implied covenant) causes of action in plaintiffs' second amended complaint allege, "[O]n or about August 26, 2009, Plaintiffs' residence [premises] sustained covered direct physical losses as stated above in Plaintiffs' factual allegations." These allegations are incorporated in all remaining causes of action. These allegations constitute judicial admissions by which plaintiffs are bound. "'"A defendant moving for summary judgment may rely on the allegations contained in the plaintiff's complaint, which constitute judicial admissions. As such they are conclusive concessions

11

of the truth of a matter and have the effect of removing it from the issues." [Citations.]' [Citation.] The admissions may not be contradicted in opposing summary judgment." (*Mark Tanner Construction, Inc. v. HUB Internat. Ins. Services, Inc.* (2014) 224 Cal.App.4th 574, 586–587.)

In addition, Anna Jangozian admitted in her deposition that she smelled or felt the smoke from the fire in the air and experienced difficulty breathing "one or two days after" "the first day." She further testified that the ashes were falling "just like snowflakes" outside the house, and the ash entered the house when anyone opened the door or walked in from outside. She first saw the ash inside her house in close temporal proximity to when she first saw it outside the house.

Defense counsel asked Vartan Jangozian at his deposition to describe the conditions at his home "[d]uring the time that the fire was burning." Mr. Jangozian replied, "I can just say a few days after the fire, our whole backyard had—was covered with ashes, thick ashes, on—there were ashes on the cars. And we needed to use brush to collect it or to clean it. [¶] And there was a stinging sensation in our eyes because of the smoke. And then also we had a problem breathing." Defense counsel asked if they experienced the difficulty breathing and stinging eyes inside the house. Mr. Jangozian replied, "Well, of course, it is very clear when you open the door and close the door, you go in and out, the same smoke comes to the house but, of course, not to the same degree as it is outside."

Through plaintiffs' admissions in their second amended complaint and depositions, Farmers established that plaintiffs knew on or, at the latest, within a few days after August 26, 2009, that smoke and ash from the wildfire had entered their home and caused appreciable damage. Although plaintiffs may not have known at that time the full extent of the damage that would ultimately accumulate, the entry of these materials was unusual, and the evidence clearly established that plaintiffs knew the smoke and ash were from the wildfire, not the "normal wear and tear" caused by dust and air pollution. Plaintiffs' deposition testimony regarding their respiratory difficulties further established that plaintiffs either knew or should have known that the materials deposited in their

12

home by the wildfire's smoke and ash posed the health hazard they alleged in their second amended complaint.

Against this showing, plaintiffs principally offered several excuses that were neither valid nor sufficient to raise a triable issue of material fact regarding the inception of loss date. Plaintiffs argued, and their declarations stated, that Farmers did not tell them about the one-year limitations period, no one told them the "suit against us" provision applied to either plaintiff, and that the "suit against us" provision does not contain the words "'you'" or "'insured.'" Farmers specifically and repeatedly advised plaintiffs of the limitations provision in letters sent directly to Vartan Jangozian on March 17, April 13, and June 14, 2010. The "Suit Against Us" provision is in the Conditions section of the policy Farmers issued to plaintiffs. The "Agreement" section of the policy states, "you will . . . comply with all policy conditions," and the policy defines "you" as including the spouse of named insured. Thus, the provision applied to both the named insured, Vartan Jangozian, and his spouse, Anna Jangozian.

Plaintiffs also attempted to create a triable issue of material fact regarding the inception of loss date by arguing that Farmers did not communicate in writing with Anna Jangozian, and Vartan Jangozian requires assistance with English. Neither point is sufficient to create a triable issue of fact regarding the inception of loss date. Furthermore, although Vartan Jangozian asserts in his declaration that he "needed assistance with writings in English," we observe that his declaration, which is under penalty of perjury, is in English, and is unaccompanied by any certificate from an Armenian translator.

The only evidence relevant to the inception of loss date asserted by plaintiffs in opposition to Farmers's summary judgment motion was a portion of Anna Jangozian's declaration stating, "The smoke and ash repeatedly came into our home. It began weeks after the fire started, and continued to occur each time it was windy. When all of our cleaning could not get out the ash, sootiness, and odor, we made a claim under our insurance policy." A party, however, cannot create an issue of fact by a declaration that

13

contradicts his or her prior discovery responses. (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12.)

Admissions made in discovery are accorded great weight because they are deemed to have a "very high credibility value." (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22; *Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1087.) Accordingly, "[i]n determining whether any triable issue of material fact exists, the trial court may, in its discretion, give great weight to admissions made in deposition and disregard contradictory and self-serving affidavits of the party." (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451.) Thus Anna Jangozian's attempt in her declaration to contradict the operative complaint and her deposition testimony is entitled to no weight and is insufficient to create a triable issue of material fact.

Plaintiffs argue that their "loss was progressive." The portion of Anna Jangozian's declaration quoted above would support a finding that damage to plaintiffs' home was exacerbated "each time it was windy," but this is immaterial to determining the inception of loss date, and therefore insufficient to create a triable issue of material fact regarding that date. The pertinent point is the *inception*, not completion, of loss, and the *Prudential-LMI* standard quoted above applies to progressive losses. The time began to run when any damage became reasonably apparent, not when plaintiffs learned the full extent of the damage. (*Doheny Park*, *supra*, 132 Cal.App.4th at p. 1086.) Thus, while the "progressive" nature of the damage may have made it harder to assess the cost of remediation, it did not delay the inception of loss.

Finally, we note plaintiffs' allegation in their second amended complaint that they did not realize that "their damage was covered under their homeowners insurance policy" until "several months later" when neighbors told them of receiving payment from their own insurers for similar damage claims. This belated discovery was "without import. 'It is the occurrence of some . . . cognizable event rather than knowledge of its legal significance that starts the running of the statute of limitations.'" (*Abari*, *supra*, 205 Cal.App.3d at p. 535.)

14

Accordingly, we conclude no triable issue of fact exists as to the date of the inception of loss, which was on or about August 30, 2009.

### (2)    Duration of tolling

Plaintiffs contend that the trial court erred by concluding that there was no triable issue of material fact regarding whether Holker's April 13, 2010 letter to plaintiffs "was an unequivocal denial of [plaintiffs'] entire claim" that terminated tolling of the limitations period. Based upon our de novo review of the parties' separate statements of fact and the evidence cited therein, we conclude that the trial court was correct. Farmers denied plaintiffs' claim by means of the April 13, 2010 letter, ending the tolling period until plaintiffs protested the denial on June 1, 2010. Accordingly, the one-year limitations period ran 42 days before plaintiffs filed this action, which, as detailed below, was fatal to all but one of plaintiffs' claims.

Plaintiffs allege in the second amended complaint that they submitted a claim under their homeowners policy on or about February 18, 2010. The Holker declaration states that plaintiffs submitted their claim on February 19, 2010. This one day difference is inconsequential, because the complaint in this case was either timely, or filed 42 days too late. Accordingly, we give plaintiffs the benefit of the extra day and utilize the February 18, 2010 claim submission date, as did the trial court.

The April 13, 2010 letter began by stating, "This correspondence will provide you with the results of Fire Insurance Exchange's investigation and evaluation regarding the above-referenced claim." It further reported that FACS had "determined there were insufficient levels of smoke, ash and/or soot related to the August 2009 wildfires to require any remediation for the personal property of the residence." In accordance with that statement, the table in the letter clearly indicated that Farmers was not recognizing any damage to contents or paying any amount for damage to contents. In contrast, the "Building" column in the table listed an estimate for damages, deductions for depreciation and the deductible, and the amount Farmers paid for that damage in a check enclosed with the letter.

15

The letter continued, "Based on the foregoing, we regret to inform you that Fire Insurance Exchange must partially deny the present claim for smoke, ash and/or soot damage." The letter then informed plaintiffs how to contact the state Department of Insurance if they believed "the decision in this matter is incorrect," and advised them of the limitations period. Finally, the April 13, 2010 letter advised plaintiffs, "If you are in possession of any additional or different factual information that you believe would affect this decision, please notify us immediately."

Vartan Jangozian admitted during his deposition that he received and read the letter. He further admitted accepting the Farmers's check enclosed with the letter and using a portion of the funds to have "a crew" clean the house. Anna Jangozian testified at her deposition that when they received the check, "[M]y husband told me that that [*sic*] with that check, there was a letter indicating that that was their final decision, which, I mean, you can only conclude that they had no intentions of doing anything else."

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

The language of the letter itself was sufficient to constitute an unequivocal denial of plaintiffs' contents claim, and of their claim regarding damage to the building except for clean up and replacement work specified in the letter and for which Farmers paid plaintiffs. The introductory sentence of the letter stated that the purpose of the letter was to "provide you with *the results* of Fire Insurance Exchange's *investigation and evaluation regarding the above-referenced claim*." (Italics added.) The terms in that sentence indicate finality and refer to the entire claim. Next, the statement that

16

"insufficient levels of levels of smoke, ash and/or soot" were found "to require any remediation for the personal property of the residence," together with the specification of the amount of damages to contents as "$0.00" clearly reflected Farmers's decision that there was no covered damage to the contents of plaintiffs' home. Similarly, with respect to the building, the specification of FACS's recommendations for replacement of attic insulation and cleaning only as to specified areas of the home, together with the estimate of "damages" to the building clearly reflected Farmers's decision regarding the limited extent of covered loss to the building.

The final paragraph on the first page of the letter, immediately below the table listing the amount that Farmers was paying plaintiffs for the covered loss to the building, informed plaintiffs they could have any contractor perform "the repairs," and left open the possibility that "[i]f for any reason the contractor indicates the Replacement Cost estimate is incorrect," Farmers might agree to make "additional payments" if plaintiffs contacted Farmers "before the work" commenced.

Plaintiffs argue that this reference to the potential for "additional payments" rendered the letter something less than an unconditional denial of their claim because it "left the door open" for them "to receive 'additional payments.'" Although this paragraph addressed the possibility of additional payment for the cost of remediation for the portion of plaintiffs' claim that Farmers granted, i.e., cleaning of specified areas and replacement of the attic insulation, it did not suggest that either the portions of plaintiffs' claim denied by Farmers or the portions granted would remain open for further consideration, except with respect to the cost of remediation for the specifically enumerated "damages" in the portion of the claim that Farmers granted.

On the second page of the letter, Farmers stated it was informing plaintiffs that it "must partially deny the present claim." Plaintiffs argue that the partial denial means that the letter was not an unconditional denial. That it was not a complete denial, i.e., Farmers granted the part of plaintiffs' claim specified on the prior page and denied the remainder, does not mean the denial was conditional. "Partial" and "conditional" are not synonyms, and a partial denial is not inherently conditional or equivocal.

17

Furthermore, such an interpretation of the letter would not be reasonable. It would force insurers to choose between complete denial and complete acceptance of a claim—even if the claim were only partially meritorious—just to terminate tolling of the limitations period. Otherwise, every insured could circumvent the limitations period by submitting a claim that was inflated, overbroad, or partially false, or that sought payment for loss outside the scope of coverage. Such a practice would negate the purpose of the limitations period, which is "'"'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'"'" (*Prudential-LMI*, *supra*, 51 Cal.3d at p. 684.) "'"'[E]ven if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation . . . .'"'" (*Ibid.*)

The next portion of the April 13, 2013 letter advised plaintiffs how to contact the Department of Insurance if they "believe[d] *the decision in this matter* [was] incorrect." (Italics added.) After setting forth the limitations provision and addressing tolling, the letter advised plaintiffs, "If you are in possession of any additional or different factual information that you believe would affect *this decision*, please notify us immediately." (Italics added.) The letter's references to "the decision in this matter" and "this decision" underscore finality. The second quoted sentence clearly suggests that, unless plaintiffs provided Farmers with "additional or different factual information" than that already reviewed by Farmers, Farmers would not further consider plaintiffs' claim. "The extension of a courtesy, to look at anything else that plaintiffs might have to offer, did not render the denial equivocal." (*Singh*, *supra*, 63 Cal.App.4th at p. 143.)

In addition to the letter's use of words and phrases affirmatively conveying the finality of Farmers's decision, it is significant that nothing in the letter suggests that any aspect of plaintiffs' claim, as to either the contents or the building, was to remain open for further assessment as additional damages, if any, accrued. Nor does any of its language suggest that the letter was merely a tentative or partial evaluation of plaintiffs' claim or that Farmers was still investigating or considering any aspect of plaintiffs' claim.

18

The key fact in Farmer's separate statement of undisputed facts pertaining to the duration of the tolling was undisputed fact No. 17: "On April 13, 2010, based on the totality of FIE's investigation, including the FACS Inspection Report, Plaintiff(s) were advised that the Claim was being partially denied."

In attempting to raise a triable issue with respect to this fact, plaintiffs responded: "Defendant never sent a letter to Plaintiff, Anna Jangozian. The letter was sent to Plaintiff, Vartan Jangozian, was not in Armenian; does not state it contains final results; does not state specifically and clearly any time limit applicable to both Plaintiffs; does not state any calculation of the one year period and indicates that Plaintiffs should begin repairs. It does not indicate a full, final decision or closure of Plaintiffs' claim, and in fact, assures Plaintiff that the claim is still open, and while being processed 'the time spent . . . processing the claim does not count toward the one year period.' Defendant's Exhibit 'L.' [A copy of the second amended complaint.] Although the letter uses the term 'partially denied,' it requires Plaintiffs to read Defendant FACS' 'expert' report and does not state what 'part' has actually been 'denied.' Plaintiffs did not understand that any part of their claim was denied. Dec. of Vartan Jangozian, ¶ 10; Dec. of Anna Jangozian, ¶10; Plaintiffs' Exhibit 'D.'"

Paragraph 10 of Vartan Jangozian's declaration stated, "Defendant's April 13, 2010, letter was not in Armenian; was not addressed to my wife; did not state my claim was closed; advised me to begin repairs; and disputed damage to our personal belongings."

Paragraph 10 of Anna Jangozian's declaration stated, "Defendant's April 13, 2010, letter was not addressed or sent to me, and was not in Armenian. At no time did Defendant advise me that a one year time limit applied to my claim."

We conclude that none of this "evidence" creates a triable issue of material fact. The very language of the April 13, 2010 letter belies plaintiffs' assertion that it "does not state specifically and clearly any time limit applicable to both Plaintiffs." To the contrary, the fourth through sixth paragraphs on the second page of the letter expressly

set forth the one-year limitations period and inform plaintiffs where to find the provision in the policy.

Plaintiffs' similarly misstate the evidence when they assert that the April 13, 2010 letter failed to inform them as to what part of their claim was being denied. The letter states clearly that plaintiffs' contents claims were being denied and reinforces that decision in a table indicating "$0.00" in every box regarding plaintiffs' "Contents" claim. The letter also describes what portion of plaintiffs' claims regarding the "Building" was being granted, to wit, the letter's description of remediation regarding clean-up to certain designated portions of the building and replacement of attic insulation.

The fact that the letter was not addressed separately to Anna Jangozian is not material, or even disputed. The terms of the policy required both the named insured, Vartan Jangozian, and his spouse, Anna Jangozian, to "comply with all policy conditions," one of which was the limitations period. Accordingly, the limitations period applied to both plaintiffs. Plaintiffs cite no authority requiring Farmers to specify in its letter that the limitations period applied to Anna Jangozian or to include her name on the letter.

We further observe that plaintiffs' declarations submitted in support of their opposition to Farmers's summary judgment motion stated that they both lived in the insured property. As far as the record reveals, plaintiffs submitted a single claim for damages to the property from the wildfire. They did not submit a claim for loss attributable exclusively to Anna Jangozian. Plaintiffs were in communication with one another about the status of their claim, as illustrated by Anna Jangozian's deposition testimony regarding Vartan Jangozian's statement upon receiving the check enclosed with the April 13, 2010 letter.

Similarly, plaintiffs cite no authority requiring Farmers to communicate with them in Armenian. We observe again that both their declarations are in English and not accompanied by any certification from an Armenian interpreter.

Plaintiffs also cited to exhibit D in responding to Farmers's undisputed fact No. 17. Exhibit D is an excerpt from Vartan Jangozian's deposition, in which he states

20

that he read a sentence in the June 14, 2010 letter to mean that he had one year from the date of that letter within which to file the instant case. That sentence reads: "As the claim is now closed, any and all tolling of the one-year period ceases as of the date of this letter." Plaintiffs make the same argument on appeal to argue that the April 13, 2010 letter was not an unequivocal denial.

We conclude that this interpretation of the June 14, 2010 letter is not reasonable, and takes the quoted sentence entirely out of the context of the remaining language in the June 14, 2010 letter. The June 14, 2010 letter states, "The claim result based on and including the hygienist reports from Forensic Analytical was provided in our correspondence of April 13, 2010 *at which time we closed our file*." (Italics added.) The sentence immediately preceding the sentence discussed in the Vartan Jangozian deposition states that "the time spent by the insurer investigating and processing the claim does not count toward the one-year period within which a lawsuit regarding the loss must be commenced." Clearly, the reference to cessation of "tolling" in the next sentence references the period during which Farmers was, as stated in the same letter, "re-evaluat[ing]" plaintiffs' claim after it was closed on April 13, 2010 and plaintiffs submitted new information in their June 1, 2010 letter. As set forth above, an insured's submission of additional evidence, even at the insurer's invitation, does not render a previous denial equivocal. (*Singh*, *supra*, 63 Cal.App.4th at p. 145 ["[B]eginning a new period of equitable tolling based merely on a *request* for reconsideration would be anomalous. By the simple expedient of making many requests for reconsideration, claimants could extend the one-year statute at will with successive periods of tolling."].)

On appeal, plaintiffs also argue that Farmers "had not conducted any examination under oath" and "there was no statement that their investigation was complete." Plaintiffs cite no authority that either is required for a denial to be unequivocal. An insurer need not use particular words or phrases to provide an unequivocal denial of an insured's claim. (*Migliore*, *supra,* 97 Cal.App.4th at p. 605.) Similarly, plaintiffs cite no authority supporting their argument in the trial court that Farmers failed to "state any calculation of the one year period" in its April 13, 2010 letter.

21

For all of these reasons, we conclude that there was no triable issue of material fact regarding the trial court's and our interpretation of the April 13, 2010 letter as an unequivocal denial terminating the tolling period. The parties, however, have agreed that the limitations period was tolled from June 1, 2010, to June 14, 2010, while Farmers was addressing Jangozian's June 1, 2010 letter. We thus have no occasion to rule on whether that additional tolling was required by the case law, and accept the parties' agreement.

As the trial court set forth in its order granting summary judgment, the relevant periods for purposes of applying the one-year limitations statute and contractual provision were as follows: 172 days of the limitations period elapsed from the inception of loss on August 30, 2009, until plaintiffs filed their claim on February 18, 2010; 49 days of the limitations period ran between April 13, 2010, and June 1, 2010; and 186 days of the limitations period ran from June 14, 2010, until plaintiffs filed this case on December 17, 2010. The complaint was therefore filed 407 days after the inception of loss date, that is, 42 days late. Accordingly, all claims "on or arising out of" the policy are time-barred.

(3)    **The one-year limitations period barred all but plaintiffs' Unruh Act causes of action**

(a)    **Plaintiffs' nonstatutory causes of action**

Plaintiffs' first cause of action for breach of contract, i.e., the insurance policy, is barred by the limitations period because it is undeniably a claim on, and arising out of the policy. Plaintiffs conceded in the trial court and in their opening brief on appeal, and we agree, that their second cause of action for bad faith would be similarly barred.

Farmers asserted below and on appeal that all of plaintiffs' other causes of action are barred for the same reason because in these claims, plaintiffs are seeking policy benefits and the claims are merely a redux of plaintiffs' bad faith claim.

Plaintiffs provided no counter argument in their reply as to their nonstatutory causes of action, which are for fraud and intentional infliction of emotional distress. Plaintiffs' reply addresses only plaintiffs' statutory causes of action in their third and

22

seventh causes of action.  Having been given no argument to the contrary and because we independently agree that plaintiffs' nonstatutory causes of action are in essence, claims under the policy, we conclude that the trial court did not err in summarily adjudicating plaintiffs' nonstatutory causes of action in favor of Farmers.

### (b)    Plaintiffs' statutory causes of action

Plaintiffs allege in their seventh cause of action violations of the Unruh Act; that cause of action also incorporated all preceding allegations.  In particular, plaintiffs allege violations of Civil Code sections 51, 51.5, and 51.7, in that Farmers "failed to completely, accurately, properly and timely adjust plaintiffs claim, failed to undertake any reasonable claims process, claims handling and the evaluation of plaintiffs' losses and damages," "engaged in acts and conduct of careless and reckless disregard whereby they failed to honor their contracts and coverages as represented; failed to acknowledge their obligations and pay for plaintiff's losses and damages; engaged in an incomplete, discriminatory, biased and inaccurate delay and evaluation of plaintiff's benefits for losses and damages; failed to determine the existence and/or extent and nature of all of plaintiff's losses and damages; further failed to acknowledge Defendant's obligation to pay for plaintiff's losses and damages; based in part on the fact that plaintiffs are of Armenian descent . . . ."

Plaintiffs further allege that "Defendants have admitted that they used and disseminated a list of attorneys and others whom the[y] reported as having presented suspect claims, those individuals in the majority were of Armenian descent with [A]rmenian surnames.  Defendants have admitted that they flagged these claims not to be paid."

Civil Code section 51, subdivision (b) provides in pertinent part that all persons are entitled to "full and equal . . . services in all business establishments of every kind whatsoever" irrespective  of national origin.  Civil Code section 51.5, subdivision (a) prohibits in part a business from discriminating in refusing "to buy from, contract with,

23

sell to, or trade with any person" on the account of national origin.[2]  Civil Code section 51.7, subdivision (a) provides in part that all persons are entitled to be free from intimidation based on national origin.

An essential element of plaintiffs' claims under sections 51, 51.5, and 51.7 is that national origin was a "substantial motivating reason" for the denial of services, refusal to transact business, or intimidation.  (CACI Nos. 3060, 3061, 3063, and 3064.)  The statute of limitations for claims under the Unruh Act is either two or three years, depending respectively on whether the statutory liability "devolved from the common law" or "did not exist at common law."  (Rylaarsdam et al., Cal. Practice Guide: Statutes of Limitations (The Rutter Group 2015) ¶¶ 4:620 to 4:646, pp. 4-74 to 4-76.)

In moving for summary adjudication of plaintiffs' Unruh Act claims, Farmers did not address whether the two- or three-year statute of limitations applied to plaintiffs' Unruh Act claims.  Nor did Farmers attempt to demonstrate that discrimination against Armenians was not a "substantial motivating reason" for the partial denial of plaintiffs' claims arising out of the Station Fire.  Farmers merely recited facts regarding the expiration of the one-year limitations period in the policy and under the Insurance Code, apparently assuming that the Unruh Act claims were no different from plaintiffs' contractual claims.

Apparently Farmers viewed plaintiffs' allegations of discrimination against Armenians as just another variation on their bad faith theme.  To extend the musical metaphor, the Unruh Act is not just a variation on the same melody.  It is a different melody.  It is precisely the alleged discriminatory motivation for the denial of part of plaintiffs' insurance claim that makes plaintiffs' Unruh Act claims different from plaintiffs' insurance policy based claims, or put differently, these claims do not arise simply out of the insurance contract.

_____

[2] Civil Code sections 51 and 51.5 are intended "to prohibit businesses from engaging in unreasonable, arbitrary or invidious discrimination."  (*Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1174.)

Nowhere does Farmer recognize this distinction in its separate statement of facts, which merely repeats the history of the correspondence between the parties and the one-year limitations period in the policy and under the Insurance Code. Farmers never addressed in its motion for summary adjudication the above allegations of predetermined denials of claims based at least in part on an insured's Armenian surname. For all these reasons, Farmers failed to meet its initial burden in moving for summary adjudication of plaintiffs' Unruh Act claims in their seventh cause of action, and the trial court erred in granting Farmers's motion as to that cause of action.

Plaintiffs' third cause of action, for violation of Business and Professions Code section 17200, incorporated all preceding allegations, which included the breach of contract and breach of implied covenant causes of action, but not the Unruh Act claims. Plaintiffs alleged in their third cause of action, "Defendants' acts as specifically stated herein, constitute unfair business practices which are illegal under California Business & Professions Code Section 17200 (which prohibits unfair competition, which includes unlawful, unfair or fraudulent business acts or practices and unfair, deceptive or untrue acts)." Plaintiffs further alleged, "As a proximate result of Defendants' course of unfair and deceptive conduct Plaintiffs have been injured as previously alleged. Plaintiffs seek all relief allowed pursuant to statute."

Business and Professions Code section 17200 defines unfair competition to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Although theoretically plaintiffs could have premised their unfair competition claim upon the Unruh Act violations, they did not allege so here. In deciding a summary adjudication motion, the trial court, as are we, was bound by the four corners of the operative pleading. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258 [the operative complaint "limits the issues to be addressed at the motion for summary judgment"].)

25

In *Abari*, *supra*, 205 Cal.App.3d at page 536, the court concluded an "unfair practices" claim was "a transparent attempt to recover *on the policy*," and was thus subject to the contractual limitations period. Given that plaintiffs failed to incorporate their Unruh Act allegations, plaintiffs' unfair business practices cause of action was nothing more than an attempt to recover money under the policy for partial denial of plaintiffs' claim, and it is thus time-barred.

In sum, the trial court correctly summarily adjudicated all but plaintiffs' seventh cause of action. As to that cause of action, the trial court erred in granting Farmers's summary adjudication motion, and thus, in granting summary judgment.

### (4) Waiver and estoppel to assert limitations period

Plaintiffs argue that Farmers waived and is estopped from relying upon the limitations period because it "failed to clearly and unequivocally assert an applicable time limit to [plaintiffs] in April, or on any date thereafter," and never communicated with Anna Jangozian. As previously addressed in this opinion, these arguments do not create a triable issue of material fact on the theory of either waiver or estoppel. Farmers consistently asserted the limitations period and plaintiffs proffered no facts supporting estoppel.

Because we reverse the entry of summary judgment with respect to the Jangozians, we need not address their contention that the trial court erred by denying their motion to tax costs.

## THE POGOSSIANS' CASE

## BACKGROUND

On October 20, 2010, Simon and Gegouie Pogossian filed their original complaint, seeking damages against Mid-Century Insurance Company (Mid-Century) and others on several theories following denial of their insurance claim for ash and smoke damage to their Sherman Oaks home from the Station Fire. After plaintiffs made a claim under their homeowners policy, Mid-Century engaged hygienist Clark Seif Clark, Inc., to evaluate the damage to plaintiffs' home. Clark Seif Clark recommended that certain parts of the home be cleaned, and Mid-Century obtained an estimate for the work that was less than

26

the plaintiffs' deductible. Accordingly, Mid-Century denied the claim. Plaintiffs, like the Jangozians, hired Safeguard and Patterson to evaluate the damage and cost of remediation, and submitted their reports to Mid-Century, which stood by its denial.

The operative first amended complaint asserted the following causes of action against Mid-Century: breach of contract; breach of implied covenant of good faith and fair dealing; violation of Business and Professions Code section 17200; intentional infliction of emotional distress; fraud; negligent misrepresentation; concealment; and violation of Civil Code section 51.5 et seq.

Ultimately, as addressed later in this opinion, the trial court granted Mid-Century's motion for terminating sanctions for failure repeatedly to comply with the court's discovery orders, and entered judgment against plaintiffs.

## DISCUSSION

**1.     Propriety of overruling demurrer to Mid-Century's answer to first amended complaint**

Mid-Century served and filed its answer to the first amended complaint on September 30, 2011. Plaintiffs filed a demurrer to that answer on October 12, 2011. The trial court heard the demurrer on November 17, 2011, and overruled it, noting it was untimely because the demurrer was served and filed more than 10 days after Mid-Century served its answer.

Plaintiffs contend that the trial court erred by overruling their demurrer because Mid-Century pleaded insufficient facts to support their affirmative defenses.

A demurrer to an answer must be filed within 10 days after service of the answer. (§ 430.40, subd. (b).) Plaintiffs' demurrer to Mid-Century's answer was filed on a Wednesday, 12 days after service of the answer, with at most a one-day extension due to a holiday. The trial court did not err by overruling plaintiffs' untimely demurrer.

**2.     Propriety of denying motion for protective order re discovery**

In August of 2011, Mid-Century served several types of written discovery on plaintiffs, including 142 special interrogatories to Simon Pogossian and 126 special interrogatories to Gegouie Pogossian. The special interrogatories were accompanied by

27

declarations of an attorney representing Mid-Century that stated that the number of interrogatories propounded was "warranted under section 2030.050 of the *Code of Civil Procedure* because there are extensive factual and legal issues presented by the Complaint, on file herein, and the instant set of specially prepared interrogatories are the most expedient method of obtaining the necessary information to enable the propounding party to conduct an adequate investigation into the claims presented herein." The declarations also stated, "None of the interrogatories in this set is being propounded for any improper purpose, such as to harass the party, or attorney for the party, to whom it is directed, or to cause unnecessary delay or needless increase in the cost of litigation."

Plaintiffs filed a motion for a protective order with respect to the special interrogatories and requests for admissions and production of documents. Mid-Century opposed the motion on several grounds, including that (1) plaintiffs had not made an attempt to meet and confer regarding any of the discovery other than the special interrogatories, and with respect to the special interrogatories, their ultimatum that the interrogatories be withdrawn did not constitute a reasonable and good faith attempt to meet and confer; (2) the bulk of the special interrogatories was four-part contention interrogatories; and (3) the number of special interrogatories was justified by the length of the operative complaint, the number of causes of action, and the complex and unusual nature of plaintiffs' claims in the action.

The trial court denied plaintiffs' motion in its entirety on two grounds: plaintiffs had made inadequate efforts to meet and confer, and "[t]he discovery at issue is valid contention discovery, propounded as the interrelated use of Requests For Admissions and Special Interrogatories. Their length flows from the complexity of the pleading at issue and the number of claims and parties. Legal contentions are a valid subject of contention interrogatories." The court further noted the case had been assigned to the Complex Civil Litigation Program along with other Station Fire cases.

On appeal, plaintiffs contend that the trial court abused its discretion with respect to the special interrogatories only. Plaintiffs argue that Mid-Century "failed to justify the number of interrogatories served in its Opposition to Appellants' motion," and the trial

28

court "simply rubber stamped the discovery" and "did not consider the merits of this one case, but simply viewed it as complex by virtue of its inclusion in the Complex Civil Litigation Program."

### a.    Pertinent legal principles

Section 2030.030, subdivision (a)(1) permits a party to propound 35 special interrogatories relevant to the subject matter of the pending action.  "Subject to the right of the responding party to seek a protective order under Section 2030.090, any party who attaches a supporting declaration as described in Section 2030.050 may propound a greater number of specially prepared interrogatories to another party if this greater number is warranted because of any of the following:  [¶]  (1) The complexity or the quantity of the existing and potential issues in the particular case.  [¶]  (2) The financial burden on a party entailed in conducting the discovery by oral deposition.  [¶]  (3) The expedience of using this method of discovery to provide to the responding party the opportunity to conduct an inquiry, investigation, or search of files or records to supply the information sought."  (§ 2030.040, subd. (a)(1)–(3).)  "If the responding party seeks a protective order on the ground that the number of specially prepared interrogatories is unwarranted, the propounding party shall have the burden of justifying the number of these interrogatories."  (*Id.*, subd. (b).)

Section 2030.090 allows the would-be responding party to move promptly for a protective order regarding interrogatories.  The motion must be accompanied by "a meet and confer declaration" showing that the moving party made a reasonable and good faith attempt to resolve the issues out of court.  (§§ 2030.090, subd. (a), 2016.040.)  "The court, for good cause shown, may make any order that justice requires to protect any party or other natural person or organization from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense."  (§ 2030.090, subd. (b).)

Discovery orders, including orders granting or denying a motion for a protective order regarding discovery, are reviewed for abuse of discretion.  (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733; *People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1552.)  "A determination of whether an attempt at

informal resolution is adequate also involves the exercise of discretion. The level of effort at informal resolution which satisfies the 'reasonable and good faith attempt' standard depends upon the circumstances. In a larger, more complex discovery context, a greater effort at informal resolution may be warranted. In a simpler, or more narrowly focused case, a more modest effort may suffice. The history of the litigation, the nature of the interaction between counsel, the nature of the issues, the type and scope of discovery requested, the prospects for success and other similar factors can be relevant. Judges have broad powers and responsibilities to determine what measures and procedures are appropriate in varying circumstances." (*Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 431.)

**b.     The trial court did not abuse its discretion by denying the motion for a protective order**

**(1)     Inadequate meet and confer**

Plaintiffs' sole meet and confer effort before filing their motion for a protective order consisted of a brief letter dated September 1, 2011, that complained of the number of special interrogatories, characterized the number as "<u>truly oppressive, unreasonable</u>," and "<u>bad-faith discovery conduct</u>" "not meant to garner information to assist your clients in this matter," but "simply meant to harass Plaintiffs." The letter continued, "I therefore, request that you withdraw the current sets of Special Interrogatories and re-draft and limit same to just what you will need. Absent same, we intend to file a Motion for Protective Order. [¶] <u>Please advise no later than 4 p.m. tomorrow, September 2, 2011 whether you will do so.</u>"

Mid-Century responded by plaintiffs' deadline, and explained that "each interrogatory is based on specific contentions made by and/or on behalf of plaintiffs in the Second [*sic*] Amended Complaint. These are contention interrogatories and as such are generally separated into groups of four interrogatories, to wit, a separate interrogatory inquiring whether the responding party is making a contention as to some allegation in the complaint, and if so, to identify the facts, documents, and persons that support the contention."

30

Mid-Century noted the plaintiffs had alleged many types of improper conduct, including, "claims handling bias based on Plaintiffs' ethnicity, improper claims handling, medical issues for certain individuals created by defendants' conduct, the proper parties to the insurance contract, [and] representations made at the time the policy was procured." It explained: "If Plaintiffs are no longer making any of the various contentions set forth in the specially prepared interrogatories, a simple answer of 'no' is required and the three questions that follow would be inapplicable. However, if Plaintiffs continue to make these contentions, then the interrogatories will 'garner information to assist [our] clients in this matter' and defendant is entitled to know what facts, documents, and persons Plaintiffs claim support these various contentions." Plaintiffs did not respond to Mid-Century's letter.

Given plaintiffs' 102-paragraph first amended complaint pleading eight causes of action, with damage allegedly suffered not only by the two named plaintiffs but also by their nonparty mother and son, we cannot conclude the trial court abused its discretion by concluding that plaintiffs' conclusory ultimatum did not constitute a reasonable and good faith attempt to resolve their issues out of court. When writing to Mid-Century, plaintiffs did not identify any particular interrogatories or groups of interrogatories that they believed were inappropriate, redundant, abusive, or otherwise not meant to "garner information to assist" Mid-Century in responding to plaintiffs' action. Plaintiffs simply labeled the entire sets oppressive and unreasonable based upon the number of interrogatories, and demanded that Mid-Century withdraw them. After Mid-Century's prompt response attempting to explain why it had propounded such a large number of interrogatories, plaintiffs failed to refine or further explain their concerns.

"A reasonable and good faith attempt at informal resolution" "requires that counsel attempt to talk the matter over, compare their views, consult, and deliberate." (*Townsend v. Superior Court* (1998) 61 Cal.App.4th 1431, 1439.) For all of these reasons, the trial court did not abuse its discretion by concluding plaintiffs were required to make a greater effort at informal resolution.

## (2) Lack of good cause for protective order

After reviewing Mid-Century's special interrogatories in light of the first amended complaint, we conclude the trial court did not abuse its discretion by finding that plaintiffs had failed to demonstrate good cause for a protective order. Many of the interrogatories propounded to Gegouie Pogossian were identical to those propounded to Simon Pogossian. For example, interrogatories 1 through 8 were identical for each, as were interrogatories 20 for Simon Pogossian and 9 for Gegouie Pogossian, 48 for Simon Pogossian and 10 for Gegouie Pogossian, 53 through 64 for Simon Pogossian and 11 through 22 for Gegouie Pogossian, 73 through 76 for Simon Pogossian and 25 through 28 for Gegouie Pogossian, 78 through 89 for Simon Pogossian and 65 through 75 for Gegouie Pogossian, 92 through 94 for Simon Pogossian and 77 through 79 for Gegouie Pogossian, 105 through 109 for Simon Pogossian and 80 through 84 for Gegouie Pogossian, 114 through 125 for Simon Pogossian and 89 through 101 for Gegouie Pogossian, and 126 through 142 for Simon Pogossian and 106 through 122 for Gegouie Pogossian. The burden upon each plaintiff and their attorney was thus not as great as the sheer number of special interrogatories might suggest, because the responses to the identical interrogatories to each plaintiff were likely to share strong similarities, or, perhaps, be identical.

Furthermore, as Mid-Century and the trial court noted, most of the interrogatories were contention interrogatories addressing specific allegations in the lengthy operative complaint and seeking information expressly permitted by the discovery statutes: "An interrogatory may relate to whether another party is making a certain contention, or to the facts, witnesses, and writings on which a contention is based." (§ 2030.010, subd. (b).) As the trial court also observed, the number of interrogatories "flows from the complexity of the pleading at issue and the number of claims and parties."

Plaintiffs did not simply allege breach of contract and breach of implied covenant claims based upon Mid-Century's failure to pay their claim. They instead named both Mid-Century and Farmers Group Inc. as defendants. They alleged that both defendants issued the policy; misrepresented their intent to pay covered losses for ash and soot from

32

a wildfire and other matters; concealed their intent not to pay for covered losses and other matters; inadequately investigated their claim; and improperly denied their claim pursuant to "a plan to deny all claims such as Plaintiffs[']," based upon "a list of attorneys and insureds whose claims they had predetermined were 'suspect' and would not pay" because the attorneys and insureds had "'foreign' surnames, predominantly of Armenian derivation." Plaintiffs also alleged that residents of their home not named as parties became ill as a result of the soot, ash, and odor that permeated plaintiffs' home. They alleged eight causes of action, including violations of the Unruh Act and Business and Professions Code section 17200. The number of special interrogatories was proportional to the number and complexity of plaintiffs' theories of Mid-Century's wrongdoing and the length of the operative pleading.

In addition, as Mid-Century asserted, most of the special interrogatories to each plaintiff fell into groups of three or four asking whether a specific contention was made, and if so, seeking the facts supporting that contention, plus identification of supporting witnesses and documents. For example, interrogatory No. 57 to Simon Pogossian stated, "Do YOU contend that the SUBJECT PROPERTY sustained covered direct physical loss on or about August 26, 2009, as alleged in ¶26 of YOUR COMPLAINT?" Interrogatory No. 58 to Simon Pogossian stated, "If YOU contend that the SUBJECT PROPERTY sustained covered direct physical loss on or about August 26, 2009, please state all facts upon which YOU base YOUR contention." Interrogatory No. 59 to Simon Pogossian stated, "If YOU contend that the SUBJECT PROPERTY sustained covered direct physical loss on or about August 26, 2009, then IDENTIFY all PERSONS with knowledge of the facts upon which YOU base YOUR contention." Interrogatory No. 60 to Simon Pogossian stated, ""If YOU contend that the SUBJECT PROPERTY sustained covered direct physical loss on or about August 26, 2009, then IDENTIFY all DOCUMENTS that support YOUR contention." Thus, the number of topics addressed by the special interrogatories was less than the number of interrogatories, and if plaintiffs did not make a particular contention addressed by the first part of each such set of

33

interrogatories, they did not have to respond to the other two or three interrogatories in the same group seeking supporting facts and identification of witnesses and documents.

Plaintiffs argue, as they did in the trial court, that the section 2030.050 supporting declarations by defense counsel accompanying Mid-Century's special interrogatories were deficient because they "failed to state any reasons why the factors [in section 2030.050] relied upon were applicable to this lawsuit." The declarations accurately stated that the operative complaint presented "extensive factual and legal issues." The trial court's implicit conclusion that the special interrogatories were an expedient method of obtaining the information was not arbitrary, capricious, or patently absurd.

For all of these reasons, the trial court did not abuse its discretion in finding that plaintiffs had failed to show good cause for a protective order.

**3.      Propriety of granting motions to compel responses to special interrogatories and further responses to requests for production**

In December of 2011 and January of 2012, Mid-Century filed seven motions to compel responses and further responses to discovery, and to deem matters admitted, all with requests for monetary sanctions. On March 19, 2012, the trial court granted the motions, in whole or in part, and awarded monetary sanctions against plaintiffs and their attorneys. Only the following three motions are at issue on appeal: motions to compel Simon Pogossian and Gegouie Pogossian to provide further responses to requests for production of documents, and a motion to compel Gegouie Pogossian to provide responses without objections to the special interrogatories addressed in the preceding section of this opinion.

**a.      Motion to compel Gegouie Pogossian to respond without objections to special interrogatories**

In its motion seeking responses without objections by Gegouie Pogossian to special interrogatories, the declaration of counsel for Mid-Century and an attached copy of Gegouie Pogossian's responses established that these responses were neither signed by counsel nor verified by Gegouie Pogossian. Her responses were served on October 3,

34

2011, prior to the hearing on plaintiffs' motion for a protective order, but no additional responses were served after the trial court denied the protective order.

Mid-Century argued that the responses were ineffective because they were not entirely objections, yet were not verified, and because plaintiffs' counsel did not sign them. Mid-Century further argued that Gegouie Pogossian waived all objections by failing to serve effective responses and asked the court to order her to respond without objections.

In opposition to the motion, plaintiffs' attorney filed a declaration stating that her assistant had inadvertently uploaded to the CaseHomePage Web site an unsigned, unverified copy of Gegouie Pogossian's responses. Counsel attached a signed and verified copy of the responses to her declaration. Plaintiffs argued that Mid-Century had made an inadequate attempt to meet and confer, and sought sanctions for having to oppose the motion.

The trial court granted the motion and ordered Gegouie Pogossian to provide verified responses without objections. Its minute order explained: "Unverified responses are no responses unless the response is entirely objections (which is almost always bad practice). The October 3, 2011, responses at issue here were unverified when the motion was brought. While advance consultation before a motion is brought for lack of verification (or lack of any objections or other form of response) is professionally proper, it is not required. (In fact, an effort at advance notice was provided on December 9, 2011.) The Court on November 1, 2011, denied plaintiffs' motion for a protective order which would have relieved them of the obligation to respond to these interrogatories (to which the October 3 version of a purported response had already been supplied) and ordered plaintiffs to respond by December 1, 2011. No further responses, verified or otherwise were provided, and no new objections were tendered by counsel by the court-set deadline."

The court continued: "Plaintiffs' counsel in response has now pled clerical error by her assistant and belatedly proffered signed and verified versions of the October 3, 2011, response, but no response specific to this Court's November 1, 2011, order. When

35

presented on October 3, 2011, as unsigned objections, the objections were not effective. When given a chance to comply with the Court's November 1, 2011, order by providing new and complete initial responses on the extended, court-ordered due date of December 1, 2011, plaintiffs did nothing in response, either to restate objections with an attorney signature or to provide adequate responses. The Court has reviewed the October 3, 2011, objections and finds them boiler-plate and without merit and denies the request in the opposition to this motion to accept the untimely proffer of the attorney signature to the October 3, 2011 [responses] as effective to preserve those responses. [¶] Accordingly, the time to object to these interrogatories has expired without any proper objections having been made, and plaintiff is now ordered to provide verified responses without objection by March 29, 2012."

Plaintiff Gegouie Pogossian contends that the trial court "abused its discretion in granting the motions [*sic*] to compel further [*sic*] responses to special interrogatories" because it "completely ignored valid case law that holds objections are proper despite the lack of a verification for any substantive responses served with the objections."

### (1)    Pertinent legal principles

Section 2030.250, subdivision (a) provides, "The party to whom the interrogatories are directed shall sign the response under oath unless the response contains only objections." Section 2030.250, subdivision (c) requires the attorney for the responding party to "sign any responses that contain an objection." Unsworn responses "are tantamount to no responses at all." (*Zorro Inv. Co. v. Great Pacific Securities Corp.* (1977) 69 Cal.App.3d 907, 914.)

Failure to serve a timely response to interrogatories results in a waiver of "any objection to the interrogatories, including one based on privilege or on the protection for work product." (§ 2030.290, subd. (a).) The propounding party may move for an order compelling responses. (*Id.*, subd. (b).)

### (2)    The trial court did not abuse its discretion

The sole basis upon which plaintiff challenges the trial court's ruling on the motion to compel responses to the special interrogatories ignores the court's actual

36

explanation for its ruling. Plaintiff's October 3, 2011 responses were ineffective not just because they were unverified, but also because they had not been signed by counsel. The verification was required because plaintiff provided a substantive response to interrogatories 80 through 92. Counsel's signature was required because her responses principally consisted of objections. As the trial court noted, plaintiff had a second chance to serve signed and verified responses after the court established a new deadline when it denied the motion for a protective order, but plaintiff did not take advantage of that opportunity. Under these facts, the court did not abuse its discretion by granting the motion and compelling plaintiff to respond to the interrogatories without objections.

### b. Motions to compel further responses to requests for production

Mid-Century's separate motions to compel each plaintiff to provide further responses to its requests for production of documents were substantially the same. In pertinent part, the motions argued that most of the responses were inadequate and improper because they simply stated objections and the following: "See documents produced in response to Clark Seif Clark Inc.'s Request for Identification and Production served September 12, 2011." Clark Seif Clark was represented by a different law firm and, according to the motions, specified different categories of documents in their requests for production. Mid-Century argued that plaintiffs must produce the responsive documents, labeled and organized to correspond to the categories Mid-Century requested.

In opposition to the motions, plaintiffs argued all nonprivileged documents had previously been uploaded to CaseHomePage and served on all parties in response to Clark Seif Clark's request for identification and production. Plaintiffs further argued that defense counsel's lengthy, detailed letter was an insufficient attempt to meet and confer because "[o]ne letter by defense counsel . . . does not constitute a proper meet and confer." Plaintiffs also sought sanctions for having to respond to the motions.

The court granted the motions with respect to each plaintiff. The court's minute order explained that the objections asserted to almost all of the requests were "boiler-plate." The court continued: "This is not good-faith compliance with discovery by plaintiffs or their counsel. [¶] Accordingly, further responses without the assertion of

37

these objections are ordered by March 29, 2012, with any associated additional documents not already produced and associated privilege log produced by the same deadline.  The response needs to identify by Bates number the documents previously produced which respond to each specific demand or else the originals of the responsive documents need to be produced for inspection in the form in which they are routinely kept."

Plaintiffs contend that the trial court abused its discretion by ordering them to "identify documents that had previously been produced by Bates numbers, and specify which demand each document corresponded to."  They argue they had previously "produced all responsive documents in the manner in which they kept them, and even attached labels to each category of document, *i.e.*, correspondence, damages, etc., so that they could be easily identified.  None of the documents previously produced by [plaintiffs] were Bates numbered, thus it was impossible for [plaintiffs] to comply with the Trial Court's Order to identify said documents by Bates number.  The Trial Court exceeded its jurisdiction when it ordered [plaintiffs] to do more than the code requires."

### (1)     Pertinent legal principles

Section 2031.210, subdivision (a) provides:  "The party to whom a demand for inspection, copying, testing, or sampling has been directed shall respond separately to each item or category of item by any of the following:  [¶]  (1) A statement that the party will comply with the particular demand for inspection, copying, testing, or sampling by the date set for the inspection, copying, testing, or sampling pursuant to paragraph (2) of subdivision (c) of Section 2031.030 and any related activities.  [¶]  (2) A representation that the party lacks the ability to comply with the demand for inspection, copying, testing, or sampling of a particular item or category of item.  [¶]  (3) An objection to the particular demand for inspection, copying, testing, or sampling."  Responsive documents are to be produced on the date specified in the demand either as they are kept in the usual course of business or organized and labeled to correspond with the categories in the demand.  (§ 2031.280, subds. (a), (b).)

38

The demanding party may move for an order compelling further responses if it considers a statement of compliance with any demand to be incomplete, an objection in any response to be too general or without merit, or a representation of inability to comply to be inadequate, incomplete, or evasive.  (§ 2031.310, subd. (a)(1)–(3).)

### (2) The trial court did not abuse its discretion

Plaintiffs' repeated directions in their responses to Mid-Century's requests for production to "See documents produced in response to Clark Seif Clark Inc's Request for Identification and Production served September 12, 2011" were neither a statement that plaintiffs would comply with the demand nor a representation that they lacked the ability to comply with the demand.  Moreover, plaintiffs apparently did not produce responsive documents for inspection, copying, etc. as required by the requests.  They therefore had not properly responded to or complied with the requests for production.

Plaintiffs' sole argument on appeal ignores the court's actual ruling, which permitted plaintiffs to *either* "identify by Bates number the documents previously produced which respond to each specific demand *or* else the originals of the responsive documents need to be produced for inspection in the form in which they are routinely kept."  (Italics added.)  The court did not *require* plaintiffs to identify the responsive documents by Bates stamp numbers, but merely permitted them to do so as an alternative to complying with the request for production as required by section 2031.280, subdivisions (a) and (b).  The court did not abuse its discretion by granting plaintiffs a potentially less burdensome alternative.

### 4. Propriety of trial court's order granting Mid-Century's motion for terminating sanctions

### a. Conduct after court's first orders compelling responses and further responses

Plaintiffs did not provide Mid-Century with responses or further responses as ordered by the trial court on March 19, 2012.  On November 15, 2012, plaintiffs entered into a stipulation with Mid-Century acknowledging they had not complied with the court's orders, and agreeing to provide responses without objections and in accordance

39

with the court's March 19, 2012 rulings by noon on November 21, 2012, for special interrogatories and form interrogatory No. 17.1, and by the close of business on December 19, 2012, for requests for production of documents and form interrogatory No. 50.1. The trial court signed an order reflecting the terms of the stipulation.

Plaintiffs provided further responses in late November and early December of 2012, but Mid-Century found them inadequate. For example, each plaintiff's responses to request for production lumped numerous categories together and continued to refer to documents produced for Clark Seif Clark, vaguely describing the nature of some, e.g., "photos taken by Defendants and CSC." Mid-Century attempted to meet and confer with plaintiffs, but plaintiffs did not respond.

### b.    Second round of motions to compel

Mid-Century filed motions to compel further responses by each plaintiff to requests for production and special interrogatories and further responses to form interrogatory No. 17.1 by Simon Pogossian, a total of five motions. Plaintiffs opposed the motions, but the court struck the oppositions to the motions pertaining to the special interrogatories and form interrogatory on the ground they were untimely filed and served.

On March 18, 2013, the court granted all five motions, ordered plaintiffs to serve further responses by March 30, 2013, and also to file their supplemental responses with the court. It also imposed monetary sanctions against plaintiffs and their attorney. With respect to the requests for production, the court noted it had previously expressly overruled plaintiffs' attorney-client and work product privilege objections, explained that medical records of plaintiff and her son and mother "remain relevant to the issues pled and warned plaintiffs "responsive documents are to be produced or the plaintiff's damages proof of physical and emotional distress damages will be precluded at time of trial." With respect to the special interrogatories, the trial court noted plaintiffs had waived their work product and attorney-client privilege objections.

Plaintiffs did not serve or file any further responses, pay the sanctions, or communicate with Mid-Century's attorneys.

**c.     Motion for terminating sanctions for noncompliance with court's second order compelling further responses**

On April 5, 2013, Mid-Century filed a motion for terminating sanctions or, in the alternative, for issue or evidentiary sanctions. Plaintiffs filed no opposition to the motion.

At the April 30, 2013 hearing on the motion, plaintiffs' counsel asserted she was unaware of the motion until the prior afternoon. She suggested that her assistant may not have docketed and printed the motion, but she had not yet spoken to the assistant. She asked for "at least a few days to make the appropriate 473 application" based upon surprise, but said that if the court would not allow her that, she would submit on the tentative ruling.

Mid-Century's counsel informed the court that on April 5, 2013, the motion had been served by uploading it to CaseHomePage and taping it to the door of plaintiffs' attorney's office. The court noted that the motion had two proofs of service, with one reflecting personal delivery. Plaintiffs' attorney informed the court that only one assistant was in her office on April 5, 2013, and the office door was locked. The court concluded that the motion was properly served and declined to postpone the hearing. It stated, "In inviting argument today, the court is simply trying to show respect in allowing the maximum due process possible. But there should have been written opposition timely." The court adopted the tentative ruling and granted the motion.

The court's minute order set forth the following explanation of the ruling: "The two named plaintiffs filed this case October 20, 2010. In March of 2011, it was first set for trial on February 6, 2012. On November 1, 2011, the Court heard cross-motions by plaintiffs for a protective order limiting discovery and from defendant for a trial continuance so that needed discovery could be obtained; all of plaintiffs' motions to avoid providing discovery were denied and the defense motion for a trial continuance was granted with a new trial date of June 4, 2012, set. On January 9, 2012, in response to a request by defendant for a trial continuance so it could get a ruling on its motion to compel plaintiffs to provide further discovery responses, the trial date of June 4, 2012, was vacated. On November 2, 2012, trial of [plaintiffs'] case was set for March 18,

2013. At the joint request of the parties by written stipulation that trial date was further continued to April 9, 2013. On February 13, 2013, at a motion hearing on a summary adjudication hearing involving the Jangozian co-plaintiffs, the Poggosian's [*sic*] April 9 trial date was vacated. On March 20, 2013, the current trial date of June 3, 2013 was set. [¶] The above summary shows that this case has been pending a long time and that problems with getting responses from plaintiff have been a major reason why the trial has been continued multiple times from its original date, which was over 14 months ago to the current trial date, which is less than five weeks away."

The court continued: "The instant motion shows (a) that defendant first sought the discovery at issue over 21 months ago, (b) that defendant obtained a court order on March 19, 2012, to provide further responses, (c) that a follow-up motion to compel adequate responses to the same demands was heard and granted on March 18, 2013, with a compliance date of March 30, 2013, and (d) that nothing has been proffered as of the motion's filing date (April 5, 2013) as attempted compliance with the Court's order. No opposition had been filed, on time (i.e. by April 17, 2013) or otherwise. A review of the electronic service records for this case on the court-approved electronic service provider (CaseHomePage)'s webpage shows no attempt to serve further responses and no purported service of any Opposition to this motion.

"The discovery at issue touches on plaintiffs' claims for damages as well as their basis for asserting that defendants have liability. As is obvious by 66 separate topics on which moving party seeks issue sanctions and the 41 separate topics on which moving party seeks evidentiary sanctions, the practical effect of granting the 'alternative' remedy of issue and/or evidentiary sanctions is to put plaintiffs' case in the same terminal condition as would happen if terminating sanctions were granted straight up, as sought in the motion papers. Mindful of plaintiffs' continuing failure to attend to their basic duties as litigants, the imminence of the much continued trial date, the failure to provide any account (plausible or otherwise) for the failure to supply the court-ordered discovery and failure to even try to oppose the motion, the Court determines in the exercise of its discretion that the requested remedy of terminating sanctions is appropriate. Since

42

terminating sanctions are being imposed, the Court sees no need to add monetary sanctions for the cost of bringing the motion to the tab.  Finality of case closure is a sufficient response to the problem presented."

Plaintiffs did not file a motion seeking relief pursuant to section 473, subdivision (b).  The court later entered judgment against plaintiffs.

Plaintiffs contend the trial court abused its discretion by granting terminating sanctions.  They argue Mid-Century's motion was filed after the March 18, 2013 discovery cutoff, the trial court should have granted a short continuance of the motion pursuant to section 473, and the order granting terminating sanctions placed Mid-Century "in a far better position than it would have been had the 'discovery been provided and been favorable.'"

### d. Pertinent legal principles

Section 2023.030 authorizes a range of penalties, including terminating sanctions, for misuse of the discovery process.  Misuses of the discovery process include "[f]ailing to respond or to submit to an authorized method of discovery"; "[m]aking, without substantial justification, an unmeritorious objection to discovery"; "[m]aking an evasive response to discovery"; and "[d]isobeying a court order to provide discovery." (§ 2023.010, ¶¶ (d)–(g).)  The trial court may order a terminating sanction for discovery abuse "after considering the totality of the circumstances:  [the] conduct of the party to determine if the actions were willful; the detriment to the propounding party; and the number of formal and informal attempts to obtain the discovery." (*Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1246 (*Lang*).)  An order imposing "terminating sanctions should not be made lightly.  But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction." (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279–280.)

The trial court has broad discretion to impose discovery sanctions, including terminating sanctions, and may be reversed "'only for manifest abuse exceeding the bounds of reason.'" (*Lang*, *supra*, 77 Cal.App.4th at p. 1244.)

43

### e. The trial court did not abuse its discretion

As recounted herein and in the trial court's minute order, Mid-Century propounded discovery to plaintiffs in August of 2011.  Their responses to that discovery led Mid-Century to file motions to compel responses and further responses, which led to the trial court's original orders to provide responses and further responses by March 29, 2012.  The court also imposed monetary sanctions against plaintiffs and their attorney in the amount of $6,500.

Plaintiffs disobeyed the court's order and did not provide responses and further responses until late November and early December 2012.  Moreover, their responses did not completely comply with the trial court's prior orders.  For example, plaintiffs did not produce the documents responsive to Mid-Century's requests for production or indicate by Bates stamp numbers which previously produced documents were responsive to each request.  They instead continued to refer to documents produced for Clark Seif Clark.  Plaintiffs had been ordered to respond to special interrogatories without objections, but continued to assert objections.  They also lumped a number of requests and interrogatories together with a single response.  Plaintiffs did not respond to Mid-Century's meet and confer efforts.

Upon motions to compel further responses, the trial court ordered plaintiffs to serve further responses by March 30, 2013, and also file their responses with the court.  The court imposed monetary sanctions of $11,355 against plaintiffs and their attorney and warned plaintiffs of evidence or issue sanctions if they did not comply.

In disobedience of the trial court's second order and disregard of its warnings, plaintiffs failed to serve or file any further responses.  They did not oppose the motion for terminating sanctions and at no time, either at the hearing or in a subsequent motion for relief pursuant to section 473, explained their failure to serve and file any further discovery responses.

Given plaintiffs' disregard for the trial court's orders, with respect to both the time of compliance and the contents of the responses, plaintiffs' repeated failures to meet and confer with Mid-Century, and their failure, when faced with terminating sanctions, even

44

to attempt to justify their disregard of the trial court's most recent order for further responses, we cannot conclude that the trial court abused its discretion by granting terminations sanctions. As stated in *Laguna Auto Body v. Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481 (disapproved on another ground in *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478, fn. 4): "Here, the justification for imposing discovery sanctions was based upon not one, but a multitude of violations. Where, as here, the record is replete with instances of delay and failure to comply with a court order, dismissal may be proper. Moreover, appellants had ample opportunity to present their arguments and excuses to the trial court. Instead, they failed to file opposition to . . . the dismissal motion, leading the trial court and us to presume they had no meritorious arguments." (*Laguna Auto Body*, *supra*, 231 Cal.App.3d at p. 489.)

The trial court was not required to adopt evidence or issue sanctions or again resort to monetary sanctions, which apparently had not been successful in securing plaintiffs' compliance with the discovery statutes and trial court's orders. "'[T]he question before this court is not whether the trial court should have imposed a lesser sanction; rather, the question is whether the trial court abused its discretion by imposing the sanction it chose.'" (*Collisson & Kaplan v. Hartunian* (1994) 21 Cal.App.4th 1611, 1620.)

Plaintiffs claim that terminating sanctions were improper because they put Mid-Century in a better position than if plaintiffs had responded to discovery. That could be said whenever terminating sanctions are awarded because terminating sanctions save the prevailing party the burden and expense of a trial. Yet terminating sanctions are expressly authorized by section 2023.030, subdivision (d). The case upon which plaintiffs rely, *Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 793, expressly recognized that "there is no question that a court is empowered to apply the ultimate sanction against a litigant who persists in the outright refusal to comply with his discovery obligations."

Plaintiffs did not raise below their contention that the motion for terminating sanctions violated the discovery cutoff. They thus forfeited this argument on appeal.

45

(*Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1011.)

Finally, we reject plaintiffs' contention that the trial court abused its discretion by failing to continue the motion. Plaintiffs argue that the motion for terminating sanctions was unsigned and the court allowed defense counsel to sign it. In the trial court, counsel for plaintiffs argued that a continuance would constitute "the same courtesy" the court had shown counsel for Mid-Century.

The court responded: "Well, most of the paperwork was signed. But the notice of motion and motion with attached memorandum of points and authorities was signed at the end of the memorandum of points and authorities, but the signature about the third page in from the front of what was the wrap-up of stating the motion per se had not been signed. [¶] The court followed the procedures contemplated by the Legislature in adopting CCP section 128.7 (a) that provides 'An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.' [¶] And that's what Miss Forman did when it was called to her attention yesterday here in court." Plaintiffs never claimed their failure to oppose the motion was somehow linked to a missing signature.

Plaintiffs also argue that the denial of a continuance was an abuse of discretion because taping the motion to the door of her office was improper personal service. Plaintiffs, however, did not and do not challenge the propriety of the electronic service of the motion. Indeed, they repeatedly served documents electronically, apparently pursuant to a case management order, and the trial court found that the motion was properly served.[3] We find no error in that conclusion.

---

[3] The parties routinely served motions and other documents electronically, apparently pursuant to the trial court's order. Plaintiffs' proofs of service for their motions, demurrers, oppositions, and discovery responses all reflect their use of electronic service and include the following language: "pursuant to the Court's Electronic Case Management Order, I instituted service of the foregoing document(s) . . . on the interested parties by submitt[ing] an electronic version of the document(s) via file transfer protocol (FTP) to CaseHomePage through the upload feature at

46

Most significant, plaintiffs made neither a written motion for relief under section 473, subdivision (b), nor a sufficient showing to support such relief. In pertinent part, section 473, subdivision (b) provides: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect. Application for this relief shall be accompanied by a copy of the answer or other pleading proposed to be filed therein, otherwise the application shall not be granted, and shall be made within a reasonable time, in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken. . . . Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any (1) resulting default entered by the clerk against his or her client, and which will result in entry of a default judgment, or (2) resulting default judgment or dismissal entered against his or her client, unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect."

Plaintiffs argue on appeal that they were entitled to relief under either the discretionary or mandatory provisions of the statute. The mandatory provision requires "an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect," which plaintiffs' attorney never provided. The discretionary provision requires a showing of mistake, inadvertence, surprise, or excusable neglect and provision of "a copy of the answer or other pleading proposed to be filed." Neither plaintiffs nor their attorney provided a declaration or testimony establishing that their failure to file an opposition to the motion stemmed from mistake, inadvertence, surprise, or excusable neglect. While plaintiffs' attorney argued that she was surprised by the motion for

_____

www.casehomepage.com and therefore I have served the document(s) in compliance with and as provided for in the Electronic Case Management Order."

47

terminating sanctions and suggested without knowing that her staff must be at fault, she provided no evidence on this point. More important, plaintiffs did not make any claim, let alone provide any evidence, demonstrating that their disobedience to the court's order to serve and file further discovery responses by March 30, 2013, was caused by mistake, inadvertence, surprise, or neglect, excusable or not. Nor did plaintiffs provide a copy of either their outstanding discovery responses or their proposed opposition to the motion for terminating sanctions. Even if plaintiffs did not have time to prepare, file, and serve a written section 473, subdivision (b) motion with supporting documents in time for the date of the hearing on the motion for terminating sanctions, they were free to file such a motion thereafter, but did not do so.

Finally, we note that plaintiffs cannot demonstrate prejudice from the trial court's failure to grant a continuance because they cannot show they would have prevailed either in making a motion for relief under section 473, subdivision (b) or opposing the motion for terminating sanctions if they were allowed to file written opposition to it. We cannot speculate upon the possible contents of such motion or opposition.

For all of these reasons, we conclude the trial court did not abuse its discretion by granting Mid-Century's motion for terminating sanctions.

## 5. Propriety of partially denying plaintiffs' motion to tax costs

Mid-Century filed a memorandum of costs, seeking a total of $23,110.78, including $11,355 in unpaid sanctions that the trial court awarded on March 18, 2013, in ruling upon the motions to compel further discovery responses. Plaintiffs filed a motion to tax costs, seeking to eliminate these sanctions, numerous filing fees, the costs of videotaping the Pogossians' depositions and Armenian interpreters for those depositions, and other costs.

In its opposition to the motion to tax costs, Mid-Century withdrew its claim for certain costs, including the unpaid sanctions, $590 in filing fees, and the cost of service of process on various news agencies.

In their reply to Mid-Century's opposition and at the hearing on the motion, plaintiffs argued that the entire cost memorandum should be struck because counsel had

verified that the costs claimed were correct, yet Mid-Century had admitted in its opposition that certain items were incorrectly included. Plaintiffs also argued at the hearing that the filing fees for five motions to compel further responses included on the memorandum of costs were improper because those fees were included in the sanctions that the court awarded when it granted those motions. Mid-Century was uncertain whether the sanctions award included the filing fees, but agreed to concede to taxing $200 for the amount of such fees. With respect to why it included the sanctions on the cost memorandum, Mid-Century explained it had found no case law "one way or the other whether or not it could be included in the cost bill. [¶] Our goal was to put all of the costs that were owed into one judgment."

The trial court explained that sanctions could be collected as if the order awarding them were a judgment. It denied plaintiffs' motion with respect to deposition-related and service of process costs, but eliminated the sanctions, $200 in filing fees awarded as sanctions, and $220 in filing fees for motions or stipulations filed jointly by Farmers Group and Mid-Century because the dismissal of Farmers Group included a waiver of costs. The court thus allowed a total of $10,544.22 in costs.

Plaintiffs contend that the trial court erred by denying their motion to tax costs with respect to three categories of costs: filing fees for two separate summary adjudication motions and charges pertaining to the videotaping of, and Armenian interpretation for, the Pogossians' depositions. They also contend that the trial court abused its discretion by failing to strike the entire memorandum of costs because it "was patently false," in that it included filing fees incurred by Farmers Group and sanctions that the court had awarded against plaintiffs.

a.      **Filing fee for summary adjudication motions**

Mid-Century apparently filed separate motions for summary adjudication of issues. Neither motion is in the appellate record, but the declaration of defense counsel in opposition to the motion to tax costs stated that the "first [m]otion . . . tested only Plaintiffs' claim for breach of insurance contract," while the order on the second motion,

49

which the court granted, reveals that it addressed the merits of the intentional infliction of emotional distress and Unruh Act causes of action.

In its tentative ruling on plaintiffs' motion to tax costs, which it adopted after hearing the motion, the court explained, "The Court also agrees with this defendant that the use of multiple motions for summary adjudication was a reasonable and necessary expense and a proper way to litigate the case."

As the trial court noted, filing fees for motions are a category of costs expressly recoverable under section 1033.5, subdivision (a)(1). Section 437c does not prohibit, and in fact expressly contemplates, multiple summary adjudication motions and separate summary judgment and summary adjudication motions. (§ 437c, subd. (f)(2).) Substantial evidence supports the trial court's conclusion that the filing fees for both motions were recoverable. The two motions apparently were based upon disparate theories and supported by different evidence. The trial court could have reasonably concluded that their separate filing was reasonably necessary to an efficient and concise presentation of these disparate theories of summary adjudication. We conclude that the court did not abuse its discretion.

b.    **Costs of Armenian interpreters and videotaping for the Pogossians' depositions**

Attached to Mid-Century's opposition to the motion to tax costs was an e-mail from plaintiffs' counsel to Mid-Century's counsel stating, in reference to the depositions of the Jangozians and the Pogossians, "Also again they all need an Armenian interpreter and I again request you confirm this." The declaration of counsel for Mid-Century recounts plaintiffs' late cancellation of the deposition of Simon Pogossian on two occasions and their late notice that no interpreter would be required for the deposition of Gegouie Pogossian, which required Mid-Century to pay the interpreter service a fee of $595 for the first two cancellations and $795 for the third.

In its tentative ruling on plaintiffs' motion to tax costs, the court explained: "[T]he cost of videographers and Armenian language interpreters are legitimate[] and allowable costs. So too is the cost of last-minute cancellation of an Armenian interpreter

50

when the late notice was given by plaintiff (as here). Even if a witness is available in the jurisdiction for trial, it is prudent to videotape a deposition so that the jury can observe the demeanor at deposition of the witness, particularly if there is any recanting of prior admissions at trial. Likewise, when a witness is reasonably perceived to have limited English-language proficiency, the cost of the interpreter is a reasonable and necessary incidental expense to the proper taking of a deposition so that the transcript and/or video image could be admissible and useful at trial."

As the trial court noted, the costs of "taking . . . necessary depositions" are expressly recoverable under section 1033.5, subdivision (a)(3). In light of plaintiffs' demand for interpreters, as reflected in the e-mail from plaintiffs' counsel attached to the opposition to the motion to tax costs, plaintiffs' attempt to tax the cost of the Armenian interpreters is not persuasive.

c.      **Failure to strike entire cost memorandum**

Plaintiffs cite no authority for their contention that the trial court abused its discretion, i.e., acted arbitrarily, capriciously, or in a patently absurd manner, by taxing the unrecoverable costs instead of striking the entire cost memorandum. Nor have plaintiffs demonstrated that the trial court's failure to strike the entire cost memorandum resulted in a manifest miscarriage of justice. The mere existence of a motion to tax costs contemplates that a prevailing party may seek costs that are unrecoverable and the trial court may eliminate unrecoverable costs without striking the entire cost memorandum.

51

## DISPOSITION

With respect to B247864 (Jangozian plaintiffs), the summary judgment and the order granting summary adjudication of the seventh cause of action are reversed; the order granting summary adjudication of the first through sixth causes of action is affirmed.  The matter is remanded for further proceedings consistent with this opinion. Each party is to bear its own costs on appeal (B247864).

With respect to B250426 (Pogossian plaintiffs), the judgment is affirmed. Respondent Mid-Century Insurance Company is awarded its costs on appeal (B250426).

NOT TO BE PUBLISHED.

BENDIX, J.*

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.